**21-mj-2487-MBB**

## AFFIDAVIT OF TASK FORCE OFFICER TIMOTHY P. STANTON
## IN SUPPORT OF CRIMINAL COMPLAINT

I, Task Force Officer Timothy P. Stanton, being sworn, state as follows:

### INTRODUCTION

1. I am a detective with the Boston Police Department ("BPD"). I was appointed to the BPD in November 1989. I am currently assigned as a Detective in the Drug Control Unit ("DCU") detailed to the Boston Division of the Federal Bureau of Investigation ("FBI") as a Task Force Officer ("TFO") and member of the FBI Metro Boston Gang Task Force ("MBGTF"). In 2000, I was deputized as a federal Task Force Officer ("TFO"). As such, I am also an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code: that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516, Title 18, United States Code. My duties include working as a liaison between federal, state, and local law enforcement entities in the investigation of illegal distribution of narcotics, firearm offenses, and associated gang-related violent crimes.

2. Prior to my current assignment, I was assigned as a DCU detective in Area B-2, which encompasses the Roxbury section of the city of Boston. My duties included investigating drug-related crimes in B-2. Prior to that assignment, I was a district detective assigned to Area B-2. I investigated home invasions, armed robberies, mayhem, and firearm-related assaults, and I also assisted the Boston Police Homicide Unit on several homicide investigations. Prior to my assignment to Area B-2, I was assigned to the Drug Control Units in Areas E-18 and E-13, respectively.

3. From January 2009 to July 2012, while in my capacity as a DCU detective, I authored in excess of fifty (50) search warrants for drug and firearm-related offenses. I have participated in the execution of over one hundred (100) search warrants for drugs and bodies. These investigations have led to prosecutions and convictions in both State and Federal courts. I was promoted to the rank of detective in December 2007 and was assigned at that time to Area C-11 as a district detective. During this time, I primarily investigated firearm offenses, narcotics offenses as defined under M.G.L. c. 94C, as well as stolen and counterfeit items. Prior to my promotion to the rank of detective, I was assigned to the Youth Violence Strike Force ("YVSF") as a patrol officer, and before that I was assigned as a patrol officer in Area D, which covers the South End, Allston and Brighton sections of Boston.

4. During my career I have made over one thousand (1,000) arrests, many of which involved the crimes of unlawful possession of firearms and ammunition or the distribution and possession of narcotics. I have been trained in the collection and preservation of evidence by the Boston Police Department. I have advanced training in recognizing the characteristics of an armed gunman through the Bureau of Alcohol, Tobacco, and Firearms ("ATF"). I also attended a week-long training course conducted by the FBI in conjunction with the BPD, commonly referred to as the "FBI/Boston Police Undercover School". This course focuses on classroom instruction and practical applications of using undercover officers to conduct investigations relating to drug offenses, firearm violations, and other criminal activity. I obtained a bachelor's degree in Criminal Justice from Anna Maria College. I also participate in annual in-service trainings conducted by the Boston Police Academy. I have personal knowledge of the facts and circumstances related herein as a result of my own investigative efforts and those of other officers, who have reported their findings to me. In addition to my training, I have had extensive experience in the

investigation of the activities of drug traffickers. Since joining BPD, I have participated in hundreds of drug investigations. As a result of these investigations, I have participated in hundreds of arrests for violations of the controlled substance laws. I have written and participated in the execution of search warrants which have led to the recovery of drugs and firearms. I have testified in State and Federal Courts as a result of these investigations. I have debriefed and interviewed defendants, informants, and witnesses who have personal knowledge of drug activities and the operation of drug organizations. I am familiar with drug traffickers' methods of operation, including distribution, storage and transportation of drugs, as well as the collection of proceeds involved in the drug trade. I have personally observed undercover purchases of illegal drugs performed by police officers in the past during drug investigations. I have attended the United States Drug Enforcement Administration ("DEA") Drug Investigator Course, which covers all aspects of narcotics investigations including undercover purchases of narcotics, drug packaging, distribution methods and techniques, and handling of confidential informants. I have participated in the execution of numerous State and Federal search warrants, which have resulted in the arrests of suspects and the seizure of stolen goods and other contraband.

5.   Based on my training and experience as a Task Force Officer, I am familiar with federal narcotics laws. I know that it is a violation of Title 21 United States Code, Section 841(a)(1), for any person to knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance. I know that it is a violation of 21 U.S.C. § 846, for any person to conspire to violate the drug laws. I know that it is a violation of 18 U.S.C. §§ 1956 and 1957 to launder money and engage in monetary transactions in property derived from specified unlawful activity.

6. I am also familiar with the manners and means commonly employed by drug traffickers and drug trafficking organizations to conduct their illegal activities, including purchasing, manufacturing, storing, and distributing controlled substances, the laundering of illegal proceeds, and the efforts of persons involved in such activities to avoid detection by law enforcement. I am further familiar with the terminology and slang commonly employed by drug traffickers. I have observed and examined cocaine, cocaine base ("crack"), heroin, and fentanyl, as well as other controlled substances. I am aware of the street prices for these substances, the methods of packaging, and the jargon used in the drug trade.

## PURPOSE OF AFFIDAVIT

7. I submit this affidavit in support of a Criminal Complaint charging Raymond GAINES ("GAINES"), DOB: xx/xx/1979, with violating Title 21 U.S.C. § 841(a)(1) (possessing with intent to distribute, and distributing, cocaine base).

8. I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports made to me by agents of the FBI and other federal, state and local law enforcement agencies.

9. I submit this affidavit for the limited purpose of establishing probable cause to believe GAINES has committed the above offenses. Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in this investigation. I have set forth only the facts that I believe are needed to establish the requisite probable cause.

## THE INVESTIGATION

10. Recently, the FBI and the Boston Police Department ("BPD") have been engaged in an investigation into a drug trafficking operation ("DTO") involving GAINES.

11. This investigation has revealed that GAINES is known by investigators to be an Orchard Park gang associate, and is also actively selling crack cocaine in and around the Greater Boston area, at least as early as April, 2021. During this investigation, GAINES has met a BPD undercover police officer ("UC") at predetermined locations, on multiple occasions, where he has sold crack cocaine to the UC. In the course of the investigation, agents have reviewed consensually recorded controlled purchases of controlled substances between GAINES and the UC. Recordings in connection with these transactions include recorded telephone calls and text messages between GAINES and the UC and audio/video recordings of the controlled purchases.

12. In addition to the April 23, 2021 and May 4, 2021 controlled purchases outlined below, numerous other controlled purchases of crack cocaine have been made during this investigation from GAINES on various dates in 2021. On April 23, 2021, GAINES delivered approximately 14.9 grams of suspected crack cocaine in exchange for $800. On May 4, 2021, GAINES delivered approximately 28.7 grams of suspected crack cocaine in exchange for $1,800.

**CONTROLLED PURCHASE ON APRIL 23, 2021**

13. On April 23, 2021 investigators conducted one of the several controlled purchases of crack cocaine from GAINES, using the UC, who had been communicating with GAINES in the preceding 24 hours through a series of phone calls and text messages. During these communications, GAINES agreed to sell the UC crack cocaine, and to meet in the vicinity of the South Shore Plaza in Braintree, MA. The UC coordinated the transaction through this series of communications with GAINES' telephone.

14. After these communications between GAINES and the UC concluded, law enforcement officers provided the UC with an agreed-upon amount of official agency funds ("OAF") to complete the drug purchase. The UC was also provided with an audio/video recording

device and a transmitter, which recorded the controlled purchase. Law enforcement officers then drove the UC to the pre-arranged meeting location.

15. Around this same time, additional investigators observed GAINES exit his residence, in Bridgewater, MA, and enter a black BMW, which he drove to the pre-arranged meeting location. These investigators maintained surveillance of GAINES from his residence to the prearrange buy location. GAINES made no additional stops and did not sustain any interruptions upon arriving at the buy location.

16. While under the direction and physical surveillance of law enforcement officers, the UC met with GAINES in the vicinity of the South Shore Plaza in Braintree, MA. When GAINES arrived, the UC entered the black BMW and GAINES handed the UC suspected crack cocaine in exchange for the OAF. After the transaction, the UC exited the black BMW, which GAINES then drove away from the area.

17. After GAINES left the meeting location, agents met with the UC, who provided law enforcement officers with the suspected crack cocaine. During the debriefing of the UC, agents learned that during the transaction, GAINES sold crack cocaine to the UC, in exchange for the OAF. The off-white, rock-like substance powder substance field tested positive for the presumptive presence of cocaine base. The suspected crack cocaine has been sent to the Drug Enforcement Administration, Northeast Laboratory for additional testing.

## CONTROLLED PURCHASE ON MAY 4, 2021

18. On May 4, 2021 investigators conducted another of the several controlled purchases of crack cocaine from GAINES, again using the UC, who had been communicating with GAINES in the preceding 24 hours through a series of phone calls and text messages. During these communications, GAINES again agreed to sell the UC crack cocaine, and to meet in the

vicinity of the South Shore Plaza in Braintree, MA. The UC coordinated the transaction through this series of communications including both GAINES' telephones.

19. After these communications between GAINES and the UC concluded, law enforcement officers again provided the UC with an agreed-upon amount of OAF to complete the drug purchase. The UC was also provided with an audio/video recording device and a transmitter, which recorded the controlled purchase. Law enforcement officers then drove the UC to the pre-arranged meeting location.

20. Once again, additional investigators observed GAINES exit his residence in Bridgewater, MA, and enter the black BMW, which he drove to the pre-arranged meeting location. These investigators maintained surveillance of GAINES from his residence, to the prearrange buy location. GAINES made no additional stops and did not sustain any interruptions upon arriving at the buy location.

21. While under the direction and physical surveillance of law enforcement officers, the UC met with GAINES in the vicinity of the South Shore Plaza in Braintree, MA. When GAINES arrived, the UC entered the black BMW and GAINES handed the UC suspected crack cocaine in exchange for the OAF. After the transaction, the UC exited the black BMW, which GAINES then drove away from the area.

22. After GAINES left the meeting location, agents met with the UC, who provided law enforcement officers with the suspected crack cocaine. During the debriefing of the UC, agents learned that during the transaction, GAINES sold crack cocaine to the UC, in exchange for the OAF. The off-white, rock-like substance powder substance field tested positive for the presumptive presence of cocaine base. The suspected crack cocaine has been sent to the Drug Enforcement Administration, Northeast Laboratory for additional testing.

**CONCLUSION**

23. Based on the foregoing, there is probable cause to believe that on April 23, 2021 and May 4, 2021, GAINES did knowingly and intentionally possess with intent to distribute, and distribute, cocaine base, in violation of Title 21, United States Code, Section 841(a)(1).

I declare the foregoing is true and correct.

Timothy P. Stanton
Task Force Officer
Detective, Boston Police
Metro Boston Gang Task Force

Signed electronically and sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on this 28th day of May, 2021.

HON. MARIANNE B. BOWLER
United States Magistrate Judge